# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
December 17, 2013 Session

## STATE OF TENNESSEE v. ANGELA M. GREENE

**Appeal from the Circuit Court for McMinn County**
**No. 12-CR-4    Amy F. Reedy, Judge**

_____

**No. E2013-00475-CCA-R3-CD** - **Filed July 10, 2014**

_____

The Defendant, Angela M. Greene, was convicted by a McMinn County Circuit Court jury of first degree felony murder in the perpetration of theft, a Class A felony; aggravated assault, a Class C felony; and theft of property valued at $1000 or more but less than $10,000, a Class D felony. *See* T.C.A. §§ 39-13-202(a)(2) (2010) (first degree murder), 39-13-102 (Supp. 2009) (amended 2010, 2011, 2013) (aggravated assault), 39-14-103 (2010) (theft of property); 39-14-105(3) (2010) (amended 2012) (grading of theft). The trial court sentenced the Defendant to life as a violent offender for the first degree murder conviction, six years as a Range I, standard offender for aggravated assault, and four years as a Range I, standard offender for theft. The aggravated assault and theft sentences were imposed consecutively to each other but concurrently with the life sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support the convictions and (2) the trial court erred in admitting evidence of the victim's hearsay statements. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Richard Hughes, District Public Defender; and Kevin Miller, Assistant District Public Defender, for the appellant, Angela M. Greene.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; R. Steven Bebb, District Attorney General; and Paul Rush, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

This case relates to an assault of Robert Gravely, who died from his injuries about a month later, and the theft of his car. At the trial, Calhoun Police Chief Larry Moses testified that in 2009, he was Etowah Police Department's only detective. He said the police talked to the victim "quite often" when the victim's car was missing. He recalled three or four occasions on which the victim made complaints of this nature. He said he talked to the victim four or five times at the police station and on the telephone. He said, "He would come and complain and then the car would show back up and [the victim] would forgive and then the car would come missing again and the car would show back up and he would forgive, and it kind of went like that."

Chief Moses testified that the victim owned two or three acres, most of which was wooded. He said that in the summer, the house could not be seen from the road. He said the victim's mailbox sat by the house's front steps and was not visible from the road. He said that following the dirt or gravel driveway, the house was seventy-five to 100 yards from Athens Pike but that the distance was not as far "as the crow flies." He later said the house was at least 150 yards from Athens Pike.

Chief Moses testified that the Defendant lived at the victim's house "at least part of the time." He did not know for how long before the victim's death she lived there but said he was aware of her living there for about a year.

Chief Moses testified that the victim was unique because if he liked a person, he would talk to the person, but if he did not like a person, he "would have very little to do with" the person. He said the victim said what was on his mind but would not always provide more conversation, even if the other person wanted it.

Relative to the events in this case, Chief Moses testified that he received a call on a Sunday morning from Sergeant Eric Armstrong, who told him the victim had been found lying in the yard. He said that he went to the victim's house within six or seven minutes and that the victim had been taken away by ambulance by the time he arrived. He said that Sergeant Armstrong, Chad Bogle, the Defendant, and Ricky Bryson were present and that he later called Lieutenant Danny Jones to the scene. He said Ellen McCleary came to the scene, but he did not remember the time. He said that when they spoke by telephone, he told Sergeant Armstrong to separate the Defendant and Mr. Bryson because they were material witnesses regarding who found the victim. Referring to photographs, he described the victim's property. He identified a bench consisting of a piece of concrete about four feet long sitting on brick stanchions. He said the bench was broken.

-2-

Chief Moses testified that Sergeant Armstrong and Mr. Bogle told him the victim was "not in good shape, was extremely cold, was bruised, and [was] bleeding." He said the air temperature was in the high 20s to low 30s around 8:00 to 9:00 a.m.

Chief Moses testified that after speaking with the Defendant, he and other officers went into the victim's house and listened to the victim's answering machine messages. He said there were over forty messages on the machine and agreed they dated from the time the victim began using the machine. He said the Defendant told him she left messages for the victim before she found the injured victim. Five messages were played for the jury. The first message was from a government agency. The second message stated, "Hey, Grav, I was just checking on you this morning. Call me when you wake up. Bye." The date and time stamp indicated it was received "Monday, 8:12 a.m." The third message was from a government agency. The fourth message, left "Tuesday, 1:13 a.m.," stated, "Grav, are you there? Are you awake? Are you alive? Pick up that phone." The fifth message, left "Tuesday, 2:04 a.m.," stated, "Hey, Baby, it's me. I was just going to tell you I was dropping my daughter off for something to drink here (inaudible) you know, on 9th Street, and I will be straight on in though. I will see you in a few minutes. Bye." Chief Moses said the time stamp on the machine was incorrect. He said the Defendant acknowledged leaving the message asking if the victim was alive.

Chief Moses testified that the officers collected a red-checked shirt, a Faygo can from the yard, and the Defendant's clothes. He said they collected "clothes and various things" from the victim, although the victim had been taken away by ambulance. He identified the victim's shoe they collected, which had been in the location where the victim had lain. He identified a light aluminum cane that he collected three or four days later, when he went to the scene to look for the victim's other shoe. He identified photographs taken at the scene. He said one photograph depicted the victim's left shoe, which he found near the broken bench a few days after the right shoe was recovered. He said the Faygo can was found in the same area. He said it appeared an altercation occurred in the area. He identified photographs of a blanket, a shoe, and a shirt found in the area near the house where the victim had lain. He said the bench was about fifty-five feet from the steps. He said that the second shoe was about forty feet from the house and fifteen feet from the bench and that the cane was within two feet of the bench. He said the victim's car was on the circular driveway in front of and just past the house, about fifteen to thirty feet from where the victim had lain. He identified a photograph of the Defendant taken on the day the victim was found and one of a dent in the top of the victim's car's hood. He said that both the Defendant and Mr. Bryson had blood on their clothes and that he saw blood on Mr. Bryson's hands. He said the Defendant and Mr. Bryson called 9-1-1 and said they had tried to render aid to the victim.

-3-

Chief Moses identified photographs of the interior of the victim's house depicting the Defendant's bedroom. He said he understood that although the victim had a bedroom, he usually slept on the living room couch. He identified photographs of Mr. Bryson, Mr. Bryson's tattoo, and Mr. Bryson's shoes. He identified a document found on the front porch that listed furniture and dollar amounts. He stated that some of the document was in Chief Moses's handwriting but that it also contained an unknown person's writing. He said, though, that some of the items listed were not on the front porch. He identified photographs of the Defendant, her hands, the dent in the victim's car, "driveway marks" on a road, and an unlocked padlock on a basement door. He said that he had seen the victim's car before the day the victim was found lying in the yard and that he had never noticed a dent in the car.

Chief Moses testified that the victim's car was towed to a police impound facility. He said he and Lieutenant Jones inventoried the car later. He said that when he had been at the scene, he told the Defendant she could not take the victim's car and that she was "[n]ot happy at all." He agreed she "made a scene" with "arm fraying [sic]" and left on foot with Mr. Bryson. He said that after two to three hours at the scene, he went to the University of Tennessee (UT) Medical Center to see the victim. He identified photographs of the victim taken on the day the victim was admitted to the hospital. He said the victim was covered with "bubble blankets" attached to a heating device to raise the victim's core body temperature. He noted bruising and discoloration on the victim's right hand, lower left leg, left torso, right side from his armpit to his knee, left forearm, left hand, right eyelid, back, and stomach. He said that if the victim had the discoloration previously, he would have noticed it. He said that the victim had scratches and that some of his injuries resembled burns. He stated that marks on the victim's left stomach and left forearm appeared to be from a shoe or boot.

Chief Moses testified that on the day the victim was taken to the hospital, the victim was "in and out of" consciousness and was in "pretty bad shape." He said the victim appeared to be in pain and was sedated. He said that the victim made statements over time but that the victim said what he wanted to say, rolled his head, and would not say more. He said the victim initially stated that he was not ready to talk about what happened and later said he was unsure. He said he was concerned about pressing the victim too much and angering him. He said that sometimes when he asked the victim what happened, the victim looked at him, closed his lips, and rolled over. He said the victim stated, "I'm trying to figure if it was an accident or not." He thought he talked to the victim five or six times before the victim died. He said that on some occasions, a family member called and told him the victim was "more at himself" or more comfortable. He said he had trouble determining whether the victim was sedated or did not want to talk. He said that at one point, the victim told him that the Defendant and Mr. Bryson hurt him but that he did not know how. He said that although

-4-

the victim never told him he was afraid, he knew the victim was afraid and was moved at the hospital three or four times.

Chief Moses testified that he learned that Scott Cass, a deacon at the victim's church, thought the victim might talk to him. He said that they visited the victim together twice and that the victim opened up more. He said that before Mr. Cass and he visited the victim, the victim had already told him that the Defendant and Mr. Bryson were responsible. He said the victim never wavered from this assertion. He said, though, "[The victim] had a resolute way of saying this is what it is, and if he couldn't say this is exactly what it is he would rather not say anything at all." He said that in his earlier meetings with the victim, the victim "was still trying to figure out exactly what happened."

Regarding his last meeting with the victim, Chief Moses testified that Ellen McCleary called him and told him the victim was ready to talk. Chief Moses asked Mr. Cass to meet him at the hospital. He said the interview took place about thirty-one days after the victim's first statement on the day he was admitted to the hospital. Chief Moses took one of the police department's new video cameras, which he had never used. Although he attempted to record the conversation, the camera did not operate properly, and no recording was made. He said that Mr. Cass held the camera and that he saw the camera was in "play record" mode. He said the victim greeted him and thanked him for being "good" to him. He said the victim stated, "Larry, I'm not leaving here. You know it and I know it." He said the victim also stated, "I'm not long for this world," and said he would not leave the hospital alive. He asked the victim for an account of the events that led to his injuries.

Chief Moses testified that the victim gave the following statement: The Defendant and Mr. Bryson had been in the victim's car, came to the victim's house, and intended to leave in the car. The victim was upset that they had used his car and did not intend to let them leave in it again. He knew the Defendant and Mr. Bryson were using drugs when they were gone in his car and did not like it. An argument began inside and continued outside, where there was a "tussle." Mr. Bryson knocked down the victim and "kicked [him] in the balls." The Defendant kicked him, as well. The victim could not get up. The Defendant said, "Your car won't do you any good now you old bastard," and the Defendant and Mr. Bryson left in the car. The victim repeated that he wanted to tell the truth because he would not leave the hospital alive.

Chief Moses testified that in one of the visits he and Mr. Cass had with the victim, the victim stated that the Defendant and Mr. Bryson "left and returned and left again." He did not recall if the victim said this during the final visit. He said the victim thought he was outside from Friday night when the fight occurred until Sunday morning. He recalled the victim's stating that the fight occurred on Friday night. He said it was likely the victim could

not be seen from Athens Pike during this time. He said the victim stated that the tussle occurred next to the bench. He said that when he first talked to the victim after his hospital admission, the victim said, "The grass, the leaves were burning me, the leaves were burning me," which in hindsight he thought was the victim's description of hypothermia or frostbite. He said the victim died two days after the final statement. He said that in the earlier statements, the victim was unsure when questioned about specific things but did not express uncertainty in the last statement. He said the victim wanted to get the facts straight first and ensure he told the truth. He thought the truth was important to the victim. He said that on the day of the final statement, the victim was as lucid as he had seen him. He said the victim was alert and awake, was not drowsy, and did not appear to be under the influence or not know what he was doing. He said the victim sat up straighter in the bed than he had previously. He saw bandages on the victim's arms and hands.

Chief Moses testified that he thought the final interview had been video recorded. He said he did not discover until the preliminary hearing that no recording had been made. He said he took the camera and disk to the Tennessee Bureau of Investigation (TBI) Headquarters to determine if the recording could be recovered. He said the TBI informed him that although there was evidence that an attempt to record was made on the date of the victim's final statement, no recording was made. He said that he had not taken notes because he thought the interview was being recorded but that he had notes from the "snippets" of information the victim gave previously.

On cross-examination, Chief Moses acknowledged that he had been fond of the victim and had known him from the victim's three to five complaints about his missing car before November 2009. He said that he had seen the Defendant driving the victim's car alone and that other officers told him they had seen the Defendant and the victim in the car together after the victim complained about his car's absence. He agreed that the victim had never married and had lived in the same house, which had been his parents', for most of his life. He agreed that the Defendant lived at the victim's house "off and on" for about a year. He said the Defendant identified the bedroom with the answering machine as the one in which she slept.

Chief Moses testified that on November 9, 2009, an ambulance responded to the scene first. He agreed the victim's shirt was left behind when the victim was taken from the scene and said medical personnel often cut off a patient's clothes. He did not know if the victim was conscious when the emergency medical personnel arrived. He agreed the Defendant called 9-1-1 but did not remember if the recording reflected that she spoke to the victim during the call. He did not know the victim's position when the first responders arrived but said it was to the right of the house's steps. He agreed the mailbox was near the front of the house. He agreed the shoe found near the front of the house had the heel dented, as if it had

been worn without the foot completely inside the shoe. He agreed the walking cane was found near the broken bench, not the location the victim had been. He agreed that the first shoe was found near the house on November 9 and that the second was found seventy-eight feet from the front of the house on November 16. He said the bench looked freshly broken but acknowledged he had not been to the victim's house previously. He said that before November 9, the victim had sometimes used a cane. He said the victim walked to the police station once. He said sometimes the victim walked well but most of the time he did not. He did not know anything about the victim's medical condition. He said the victim was "[a] pretty good size fellow." He agreed that Mr. Bogle, Sergeant Armstrong, and the emergency medical responders speculated that the victim might have been beaten, hit by a car, or burned with a chemical.

Chief Moses testified that he did not know if an officer moved the victim's car before he arrived or if the dent existed "at the time of this event." He agreed he inventoried the car's contents and found items belonging to the victim, the Defendant, and Mr. Bryson. He agreed that he determined that the car needed investigating and that neither he nor the other officers offered the Defendant and Mr. Bryson a ride. He said he was surprised at the extent to which the Defendant was upset. Although he did not remember his exact words, he said that he told the Defendant that the car was part of the scene and that it would not be leaving the scene.

Chief Moses acknowledged that the victim was unsure whether the tussle occurred on Friday night or Saturday. He agreed the victim's mailbox was close to the house in order for the victim to have an easier walk to the mailbox. He agreed that if mail had been delivered on Saturday, the mailman would have seen the victim. He agreed that making the 9-1-1 call was important to saving the victim's life and that if the 9-1-1 call had not happened on Sunday morning, the victim would not have been found for another day or longer. He said the police saw the broken bench on November 9, 2009, but did not see the cane and shoe near it until later. He said that the bench was fifty-five feet from the front steps and that the victim had been four to six feet from the steps. He said that the concrete block was in the center of the driveway near the bench and that he could not determine why it was there.

Chief Moses testified that his theory of the case was that the victim crawled or scooted toward the house from the area near the bench where an assault occurred. He noted injuries on the victim's hands, elbows, forearms, tops of his feet, and stomach that he said were consistent with his theory. He acknowledged that he did not know the extent of the victim's medical concerns aside from his injuries and said he never spoke with the victim's physicians at length. He agreed that the victim was hospitalized for thirty-three days before his death and that he was moved to different hospital locations due to his medical condition.

Chief Moses acknowledged a document he created regarding his November 12, 2009 hospital visit with the victim. He said he was asked to come to the hospital by Margaret Pickett, a family friend of the victim who stayed with the victim at the hospital, or Ellen McCleary, but he did not recall if either woman was present that day. He said his hospital visits were typically prompted by Ms. Pickett's or Ms. McCleary's telling him the victim was better that day. He identified documents he created regarding his November 14 hospital visit with the victim, a November 15 conversation with the victim, and a shoe, a cane, and a can he found at the victim's property on November 16. He said that at the time of the trial, he had not been employed with the Etowah Police Department for sixteen to eighteen months, did not have access to his case file, and was testifying from memory. He acknowledged that the victim's sister, Melea Gravely, had a health care power of attorney for the victim. He agreed that the victim's answering machine contained additional messages that were not played earlier in the trial and that some of the messages were from the Defendant.

Chief Moses testified that he had specialized training in methamphetamine detection. He agreed that when he inventoried the victim's car, it contained no components of methamphetamine manufacture or evidence of methamphetamine use. He agreed he saw no evidence of methamphetamine manufacture in the victim's house and did not notice an odor associated with methamphetamine manufacture. He said he searched the victim's basement and found no evidence of methamphetamine manufacture. He was not aware of the victim's having allowed the Defendant to be listed on his auto insurance policy as a driver of his Taurus.

On redirect examination, Chief Moses identified the car inventory list, which was received as an exhibit. He said that bricks, sticks, and rocks were in the victim's yard and that he did not know when he investigated the scene how the items related to the victim's injuries. He said that before his final interview with the victim, the victim never stated he thought he would die or would not leave the hospital alive.

Regarding the victim's statement on November 15, 2009, Chief Moses testified that the victim stated that after the tussle, the Defendant "left around 9:00 and came back around 11:00" and that he thought he was outside for "most of the night." He said the victim stated that he fought with the Defendant and Mr. Bryson when the Defendant wanted to leave to get "more dope." The victim stated that the Defendant and Mr. Bryson beat him, threw an unknown liquid from the car on him, and left him lying on the ground. The victim stated that the Defendant told him the car would not do him any good.

Regarding a statement the victim gave on a date not identified by counsel or the witness, Chief Moses testified that the victim stated that the Defendant told him she was going to take his car. The victim said the Defendant had threatened previously to hit him

with his cane. Chief Moses agreed that in one of the statements, the victim said the Defendant stated that the car would not do the victim any good. He agreed that the victim told him the Defendant and Mr. Bryson kicked him in the testicles and left in a car other than his. He thought that the car was gold and agreed that he did not know whether the Defendant was "in the place." He said the victim's testicles were "black," bruised, and six to ten times larger than they should have been. He compared their size to a grapefruit.

TBI Special Agent Douglas Williams, an expert in computer evidence retrieval, testified that he examined a video recorder and disk related to the case. He said that his examination of the disk and recorder revealed "finalization" of a recording but that the file that should have contained the data was empty. He said this meant the operator failed to press the record button, the recorder "timed out" and did not permit recording, or "the device just failed." He agreed a recording was never made, not that a recording was destroyed.

On cross-examination, Agent Williams testified that there was no way to know if the disk had been in the recorder on the relevant date. He said he did not examine the recorder to determine whether he could replicate the failure or make it work properly.

Emergency Medical Technician Kevin Elliott testified that he responded to a call for assistance for a person who had fallen on November 9, 2009, around 7:30 or 8:00 a.m. He said that he knew the victim previously and that when he arrived, the victim was lying on the ground, covered with a blanket. He stated that the victim's torso was covered in bruises, that his pants had burn holes, that he did not talk but made a chewing motion, and that his skin was cool. The victim was not responsive but was able to move and was conscious. He agreed the victim was in "pretty bad shape." He said that the weather was "chilly" that morning, that it had been cold the previous night, and that he would not be surprised if the victim had frostbite. He agreed he did not see many frostbite injuries. He said the victim was taken by helicopter to UT. He said he told the police officers the victim had been assaulted. He said the victim's injuries were inconsistent with a fall. He thought he cut off the victim's shirt and gave it to an officer and said he cut the victim's pants to the thigh but did not remove them. He identified a shirt as the one he removed from the victim. He agreed the victim's clothes and body were covered in dirt and leaves.

On cross-examination, Mr. Elliott testified that the ambulance company had changed since November 9, 2009, and that he did not have any documentation relative to the call. He said he had been trained relative to hypothermia and frostbite but had never seen a patient with the conditions in twelve years on the job. He said a private car and two police cars were at the scene and did not know if any cars were moved before he arrived. He said that to his knowledge, the victim's pants went to UT with the victim. He said that based upon the amount of dirt on the victim, it appeared the victim had been in the yard and exposed to the

elements for more than a few minutes. He agreed it took more than a few minutes to develop hypothermia or frostbite. He said frostbite caused skin discoloration and in its early stages, looked like bruising.

On redirect examination, Mr. Elliott testified that the victim's pants had "burnt melted fabric" and did not look cut or ripped. He said it looked as if the victim had been hit by a car and burned by the muffler. He noted that the victim's skin below the burned pants was melted and "slipping." He said the pants holes were on the inner shins and up the thigh and knee area. He said the victim's testicles were not exposed.

On recross-examination, Mr. Elliott testified that he did not know the victim's medications and said that would have been recorded in the unavailable documentation. He said that a person taking Coumadin might bruise if he hit or bumped into something but that the victim's injuries were more extensive. He did not know if a person taking Coumadin would have the victim's injuries from frostbite and hypothermia.

Etowah Police Chief Eric Armstrong testified that he was a patrol sergeant in 2009 and that he was the first officer on the scene where the victim was found. He said the paramedics arrived about one minute later. He said a car was parked facing west toward Athens in the circular driveway, at least fifty feet from the victim. He said the Defendant and Mr. Bryson were present. He said the Defendant was near the victim, speaking to him. He thought Mr. Bryson was not near the victim but said he did not pay much attention to Mr. Bryson.

Chief Armstrong testified that the victim lay on his back under a blanket. He said he had never seen injuries like the victim's. He said the victim had a dark purple square in his chest and bleeding cuts on his legs. He thought the victim had fallen. He said the victim was dirty and wore one shoe. He said he went into the victim's house after he called then-Detective Moses. He said Lieutenant Jones helped process the scene.

On cross-examination, Chief Armstrong testified that he had seen people who had been hit by a car or involved in a motorcycle wreck. He thought the victim's chest injury could have been a severe internal injury. He said he had not previously seen frostbite. He said he did not look for the victim's second shoe that day. He said that leaves were on the ground at the scene and that the driveway was gravel.

Chief Armstrong testified that he had seen the Defendant driving the victim's car but did not think he had seen the victim in the car with the Defendant. He recalled a traffic stop in which the victim was not in the car when another officer stopped the Defendant. He said that he had seen the victim walking with a cane on Athens Pike and had been to a call about

a prowler at the victim's house but that he did not really know the victim before the relevant events.

On redirect examination, Chief Armstrong testified that he remembered the call about the prowler at the victim's house because another officer who had been to the victim's house previously cautioned him to identify himself quickly because the victim had weapons and might be on the porch. He agreed he had not seen discoloration on the victim's hands before the day he saw the victim lying on the ground.

Margaret Ellen McCleary testified that she had known the victim all her life and that the victim and her father had been friends. She described the victim as a "loner" and said he "took up with" her mother, her cousin, and her after her father died. She said the victim was socially "awkward and backward." She said he had lived with his mother until her death. She said he kept his home very clean. She said he was unskilled at conversation, although he made a statement if he had something to say and answered questions. She said that if he visited someone's house, he stood with his hand in his pocket and looked down. She said he had "Parkinson on his thumb." She said that despite his lack of social skills, the victim was helpful to others and "had a very big heart." She said the victim had never been in trouble. She said that he was well-liked and that he sang in his church's choir. She said the victim helped set her father's gravestone and put grass seed and straw over the grave.

Ms. McCleary testified that before the victim met the Defendant, he came to Ms. McCleary's mother's house almost daily. She said that after they met, the visits stopped. She described the victim as "OCD." She said he ordered cases of soap and took five to six showers daily. She said he would shower in the middle of the night if he felt sweaty. She said he always wore bleached white t-shirts and groomed his hair neatly. She said that after the victim stopped visiting her mother's house, she saw him walking to town with disheveled hair and dingy t-shirts. She said he appeared to have lost weight. She said that "something very wrong" was happening but that she did not know what. She said this took place during "several months" before his death. She estimated that the Defendant attended Zion Hill Baptist Church for more than twenty years.

Ms. McCleary testified that she had known the Defendant in high school. She said that other than at a funeral, she had not seen the Defendant since high school until she saw her with the victim. She stated that she saw the Defendant in a car at a gas station, that the victim was inside playing the lottery, and that she asked the Defendant, "What are you doing with him, what is he doing with you?" She said she was concerned because she knew the Defendant used drugs. She said the Defendant was "zipped up" and was jerking. She said she tried to talk to the victim about the Defendant three or four weeks before the events of this case.

Ms. McCleary testified that the Defendant had investments and money. She said he always insisted on paying when he took her family and her to lunch. She said he was self-sufficient and would not accept help. She said, though, that the victim's finances changed, that he mortgaged his house, and that he bounced checks. She said that at an antique shop, she found the victim's mother's possessions, hundreds of the victim's family's photographs, and six or seven quilts made by the victim's mother. She said the store's owner told her that many other quilts from the victim's house had already been sold. She said that she had seen the victim's mother's clothes stored in a chest of drawers at the victim's house. She said that the attic had been orderly for twenty to thirty years after the victim's mother died but that when the victim died, the attic had been ransacked and any items of value had been removed. She said that when the victim's brother helped the victim remodel the house and bought furniture for the victim, antique furniture that had been the victim's mother's remained in two bedrooms and the dining room. She said the victim had never talked about selling the antiques. Regarding the list of furniture and dollar amounts previously received as an exhibit, she said that a mattress and box springs were left in the house. She said that the victim's brother had bought two sets of mattresses and box springs for antique beds in the house and that the set in the victim's mother's bedroom had not been slept on. She said that an antique armoire, dresser, mirror, and night stand had been in the front bedroom. She said that a new couch, love seat, coffee tables, and end tables had been purchased by the victim's brother.

Ms. McCleary testified that she heard something bad happened to the victim and went to his house on the Sunday morning he was found in the yard. She said that when then-Detective Moses told the Defendant she could not take the victim's car, the Defendant was "furious" and "absolutely livid." She said the Defendant walked away, turned around, "flipped a 'bird,'" and said "'F' you[.]" Ms. McCleary did not think she went into the victim's house on November 9, 2009.

Ms. McCleary testified that the victim's father made the stone bench in the front yard. She said it had been in the yard all her life. She said the bench was not broken three weeks before November 9, 2009, when she talked to the victim. She said the victim was sentimental about the bench because his father made it. She was surprised to see the bench was broken on November 9.

Ms. McCleary testified that she and her mother, Margaret Pickett, alternated days staying with the victim at the hospital. She described him as being in "severe critical condition" when he was taken to the hospital. She said he was in pain until his death. She photographed his injuries. She said that the victim had been "stomped between the legs" and that his scrotum was larger than a cantaloupe, swollen to the point it seeped fluid, and black and purple. She said the victim screamed in pain when his legs touched his scrotum. She

identified a photograph of the victim's genital area. She said the victim's "burns or frostbite" wounds were debrided twice a day by scraping the skin "down to the blood," applying ointment, and wrapping in bandages. She said that the victim was given strong pain medication before the wounds were debrided but that it did not alleviate his pain. She said he was "so miserable and hurt so bad." She thought the victim was in seven hospital rooms and said he was "petrified." She said the victim watched the door and told her he was afraid the Defendant and Mr. Bryson were going to find him and "finish the job."

Ms. McCleary testified that the victim asked her to call then-Detective Moses because he wanted to talk. She said Moses came the next day when her mother was at the hospital. She said that the victim was always physically unwell at the hospital but that "a couple of days his mind was very lucid." She said the victim was able to tell her his siblings' full names, their birth dates, his full name, and how he was named after a preacher.

Regarding the time of the victim's death, Ms. McCleary testified that the victim was mostly unresponsive. She said he reacted to her voice but was unable to stay awake. She said a doctor took her, the victim's niece, and his great niece into another room and told them the medical staff had done everything they could for the victim and were going to try to make him comfortable. She said she called the victim's family members to come to the hospital to say goodbye.

On cross-examination, Ms. McCleary testified that she knew the Defendant stayed at the victim's house. She agreed she had seen them out together several times. Regarding his medical history, she said the seventy-year-old victim had a defibrillator, had Parkinson's Disease, and had been "in and out" of hospitals. She said that her parents had helped the victim with transportation to medical appointments but that the victim sometimes drove himself. She said the incident when she saw the Defendant and the victim at a convenience store was three to four weeks before November 9, 2009. She said the Defendant had been driving. She agreed she was upset and said she knew the Defendant was "on something" that day. She disagreed that the Defendant helped the victim by shopping for groceries and personal items. She said she saw the victim walking to and from a grocery store several times after the Defendant began staying with him. She said the victim's independent nature was such that she could not see his ever allowing someone to be his caregiver. She agreed she thought the Defendant took advantage of the victim and said the victim received Social Security payments, had investment income, and owned his house. Regarding her opinion of the Defendant, she said, "[A]nyone could pick up a police blotter and know what kind of lifestyle she lives."

Ms. McCleary testified that the victim had already been taken away when she arrived at his house on November 9, 2009. She said that the Defendant was "furious," that the

Defendant came to her car, that she asked the Defendant what happened to the victim, that the Defendant had two pairs of shoes and flopped them on the hood of her car, that the Defendant started "ranting and raving," and that the Defendant said the victim had been run over by a car. She said that based upon the distance to the road, it was impossible for the victim to have been run over. She said then-Detective Moses told the Defendant she needed to leave.

Ms. McCleary testified that she never saw the victim with a cane. She said that he had no problem with balance and that he walked well. She said the victim's sister, "Melea," had a health care power of attorney for the victim for a previous hospitalization but did not know if Melea still had one after the victim was injured. She said she was not present when then-Detective Moses tried to record a statement from the victim.

Dr. Darinka Mileusnic-Polchan, a forensic pathologist, testified that the victim died on December 11, 2009, from sepsis, cold exposure, and assault. She said the manner of death was homicide. She said his skin ulcers from his frostbite injuries became infected and caused the septic illness. She said the victim's injuries were consistent with blunt force trauma and frostbite. She said he had necrosis, which was dying tissue. She said injuries like the victim's might appear to have been a chemical burn to someone who did not deal with frostbite regularly. She said injuries on the victim's hand appeared to be defensive in nature. She said a contusion to the victim's side was "massive blunt force trauma" and could have been caused by his being kicked. She said injuries to the victim's abdomen could have been caused by crawling over rocks, leaves, and twigs. She said that areas of the body over bone, such as the elbow, knee, and hip were often more affected by frostbite. She noted the victim's frostbite on his knees and legs. She said that the frostbite wounds on his shins and knees were deep and became infected. She noted blunt force trauma to the victim's left abdomen and right chest. She said that the injury to the left abdomen was marked as a footprint but that she had to rely on the person who observed the injuries and took a photograph to determine whether it was a footprint. She noted blistering in a photograph of the victim's right arm, which she said was characteristic of "very acute" frostbite and could cause misinterpretation as a chemical burn. She was unsure whether frostbite was depicted in a photograph of the victim's left hand.

Dr. Mileusnic-Polchan testified that she could not determine from a photograph the cause of the victim's swollen scrotum. She did not see evidence of frostbite and said the swelling might be from a combination of trauma and medical treatment.

Dr. Mileusnic-Polchan testified that the victim's bruises could have come from a fall from a significant height, such as down a ten- to fifteen-foot stairwell. She said a fall down the victim's front porch stairs would not have caused the injuries.

-14-

Dr. Mileusnic-Polchan testified that the victim's frostbite extended to his muscles. She said frostbite injuries became deeper after longer exposure. She said his ability to recover from infection was compromised by his other medical conditions, which included heart disease, hypertrophic caridomyopathy, arteriosclerotic disease, chronic obstructive pulmonary disease, and the trauma and frostbite from the relevant events. She said he had a pacemaker. She said that infection sometimes happened in a hospital setting and that "it's really nobody's fault." She said the victim was sixty-six inches tall and weighed 232 pounds.

Dr. Mileusnic-Polchan testified that the time for development of frostbite varied based upon several factors, including the temperature, the position of the body, the location of the body, and the condition of the person. She said that "any late through the night temperature, early morning temperature" was conducive to frostbite, particularly if the person was on the ground.

On cross-examination, Dr. Mileusnic-Polchan testified that she received information that the victim and his caretaker had a dispute over the victim's car, that the caretaker's friends injured the victim, and that the victim was left in his yard overnight. She thought she reviewed a video recorded statement from the victim, but she was unsure. She said she would have reviewed the victim's medical records that were available at UT Medical Center at the time of his death. She agreed that in addition to the medical conditions about which she testified previously, the victim had Parkinson's Disease, which she acknowledged could cause tremor, affect motor skills, and affect balance. She said that although the record reflected that the victim had tremor, fell occasionally, and used a cane, the records did not reflect that he was prone to dizziness. She said pulmonary heart disease could cause dizziness. She said the victim's kidney failure was part of rhabdomyolysis, which she said was a breakdown of muscle from severe blunt force trauma and frostbite. She said the victim was "not a healthy man." She said the victim had some senile ecchymosis on his hands, which was bruising associated with light trauma to the skin of an elderly person. She said, though, that he had bruising on his knuckles that was due to blunt force trauma. She agreed that blunt force trauma meant a body hitting an object or an object hitting a body and that the term did not address whether the trauma was intentionally inflicted. She said the ulcers on the victim's body were due to frostbite and hypothermia. She said she could not determine from a photograph whether the victim had a bruise from a heel or shoe imprint. She said that at the time of the autopsy, the victim's blunt force injuries had healed and that he would have lived had his only concern been these injuries and not the frostbite.

Dr. Mileusnic-Polchan testified that blood thinner medication should not have had a major effect on the victim's bruising and skin discoloration but acknowledged it could have caused the victim to bruise easily. She agreed the victim had no healing bone fractures. She said no evidence showed the victim had chemical burns. She said she could not determine

-15-

that the victim had been hit by a car. She said that the victim had a small, benign tumor in the front of his brain but that it was unlikely he had any symptoms.

On redirect examination, Dr. Mileusnic-Polchan testified that if a person were wet and outside in cold weather, the wetness would hasten frostbite. She said that if something were poured on the victim, it would "definitely make the matters worse with the frostbite." She agreed that if something caustic were poured on the victim's pants that caused the fabric to melt, this would hasten frostbite due to the exposed skin. She said she had never seen bruising as extensive as the victim's from a fall from standing, even in patients who took blood thinner medication. Regarding the victim's scrotal sac swelling, she said this could happen due to accumulated fluid and failed circulation, rather than trauma. She said, though, that if the evidence showed the scrotum was bruised black, this indicated trauma. When shown a photograph dated November 18, 2009, she said the scrotum appeared bruised.

Cynthia Lewis testified that she knew the Defendant through her ex-husband, who had been the Defendant's classmate. Ms. Lewis acknowledged that she was on three years' probation for manufacture of methamphetamine. She agreed she contacted Larry Moses and gave him a statement in April 2010. She agreed she was uncomfortable about testifying.

Regarding visitation at the McMinn County Jail, Ms. Lewis testified that an officer recorded a visitor's name, driver's license number, and the name of the inmate the person is visiting. She said visitors pass through a metal detector. She said the visitor and the inmate are separated by glass and speak by telephone. She said that on January 31, 2010, she visited her boyfriend at the jail and that she saw the Defendant, who was also visiting an inmate. She said she was surprised the Defendant was not an inmate because she read in the newspaper that the Defendant had been arrested. She said the Defendant told her that it had been a misunderstanding and that "she didn't do it or they didn't do it." She said the Defendant also stated, "Girl, we beat him down," but did not specify if Mr. Bryson was involved. She said the Defendant stated that she and the "Old Man" argued about the car and medication. She said that she did not know the victim and that the Defendant did not refer to him by name.

On cross-examination, Ms. Lewis denied that she was coerced to testify. She said the Defendant stated that during the argument, the victim hit her with a "cane or something." Ms. Lewis said she was not using methamphetamine on January 31, 2010. Ms. Lewis said she had been in jail once. She said that she was arrested on February 14 but did not specify the year, that she gave a statement on April 7, 2010, and that she was placed on probation around Thanksgiving 2010.

On redirect examination, Ms. Lewis testified that although her plea agreement specified that she was not to commit any crimes, including perjury, her plea agreement did not involve the Defendant's case. She said the Defendant's case was never mentioned in connection with her case. She said she did not request consideration in her case for giving a voluntary statement relative to the Defendant's case.

William Scott Cass, the owner of East Tennessee Auto Outlet and a land developer, testified that he previously served as a reserve deputy for Sheriff Steve Frisbee. He had known the victim for about fifteen years. He said that he was a deacon at the victim's church and that they were friends and talked about personal and church matters. He estimated they had one-on-one conversations twenty-five times. He said they talked at church or at Mr. Cass's business, not at the victim's house. He said the victim was quiet and paused before answering questions. He said the victim played harmonica with the church's choir. He said that until "[p]robably a year prior, give or take two or three months," the victim attended church three times a week unless he or a family member was sick.

Mr. Cass testified that the victim drove a Ford Taurus, which he said would have been worth $6000 to $6500 wholesale and $8900 retail at the time of the victim's death. He identified a photograph of the car as the one the victim drove less than two months before the relevant events, which was the last time he spoke to the victim before the victim was injured. He did not recall the car's having a large dent.

Relative to the time the Defendant began living at the victim's house, Mr. Cass testified that for the first couple of months, the victim attended church sporadically but eventually stopped. He thought the victim felt "humiliated" and "like he was letting the church down." He said the victim talked to him at the beginning of the time "that this went on" and that they talked about the matter several times. He said the victim felt like he could be the person to help the Defendant after others gave up. He said he warned the victim that the Defendant was a known methamphetamine addict. He told the victim that if the relationship continued, the victim's car would be confiscated, that his house would be burglarized, that the Defendant would have an alibi, that his car would be stolen, and that he would "wind up dead." He said the victim agreed to end the relationship because the Defendant had not come to church. He said he was unaware of her ever coming to church with the victim, although he was in a different church building on Wednesdays and might not have seen her.

Mr. Cass testified that he visited the victim eight to ten times during the victim's final hospitalization. He agreed that he was with Larry Moses when then-Detective Moses tried to obtain a video recorded statement. He said Detective Moses prepared the recorder and that it seemed to be working. He said that the victim was more coherent than he had been during

-17-

previous visits and that the victim seemed at peace. He said the victim told him more than three times on previous occasions that he would not leave the hospital, although the victim did not specifically say he was going to die.

Mr. Cass testified that on the date the recording was attempted, the victim stated: The Defendant and Mr. Bryson came to his house to take the car. The victim did not want them to take the car, and Mr. Bryson struck him in the stomach. The Defendant and Mr. Bryson beat the victim "to a place in his yard . . . where he had a little bench or something" and threw an unknown substance from a jar on him. The jar looked like a "fruit jar." The altercation occurred around dark. The Defendant and Mr. Bryson "returned," took the car keys from the victim's pocket, and the Defendant said, "You will not be needing these anymore, you old bastard."

Mr. Cass testified that he could not recall whether it was on the date the recording was attempted but said the victim stated that the altercation occurred on Friday and that the Defendant and Mr. Bryson returned three times on Saturday. He said the victim stated he was unable to get up and go into the house. He said the victim was always concerned about his safety at the hospital.

On cross-examination, Mr. Cass testified that the victim was told by church leaders other than himself that he could not participate in the choir while living with the Defendant without marriage. He thought this was around the time the victim stopped attending church. He acknowledged he was never at the victim's house while the Defendant lived there or after the incident. He agreed he had used recording devices in a law enforcement capacity previously. He said had never had a recording fail before the one in this case. On redirect examination, he said he would not change his testimony based upon friendship with Larry Moses.

Douglas Williams testified for the defense that he had been a friend of the Defendant and her family for thirty years. He had known the victim for three or four years before the victim's death. He said the victim and the Defendant lived together for a "pretty good while" before the victim's death. He said he had seen the victim give the Defendant the victim's car to drive and had seen the Defendant driving it alone. He said he had seen the victim and the Defendant visiting the Defendant's mother, Faye Willis, twice.

Mr. Williams testified that the Defendant told him "they" could use extra money and that he told her she could help him haul scrap metal the next day for half of the payment. He said that he picked her up the next morning and that when they returned after completing the work, the victim was lying on the driveway near the steps. He stated that the victim was conscious, that they checked on him, and that they helped him sit up. He said the victim had

-18-

a "place" on his head, skinned arms, and one of his shoes was by the steps. He thought the victim fell down the steps but said they never could get a "straight answer" about what happened. She said that they took him into the house and that the Defendant "doctored him up." She said this was one to one and one-half years before November 9, 2009. He said he had seen the victim with cuts and bruises but had never seen him after having fallen on other occasions.

Mr. Williams testified that he saw the Defendant "off and on." When asked about other evidence that the Defendant was a bad influence on the victim, he said that both parties did not always use good judgment. He denied any knowledge of the Defendant's using methamphetamine. He was unaware of the Defendant's selling the victim's household items and said he was aware the Defendant and the victim went to antique stores together.

On cross-examination, Mr. Williams acknowledged that he did not want the Defendant go to jail. He agreed he had known the Defendant had been a drug user over the years but did not know how often she used drugs. He denied any knowledge of her selling drugs.

Nellie Faye Willis, the Defendant's mother, testified that the victim and the Defendant had a relationship on November 9, 2009. She did not think the relationship was romantic and said the Defendant stated the relationship made the victim happy. She said the victim was lonely. She said the Defendant cleaned for the victim and drove for him due to his tremor from Parkinson's Disease. She said that they had been to her house two or three times and that she liked the victim. She said the Defendant lived at her house but did not know if the Defendant spent the night at the victim's house.

Ms. Willis testified that two or three months before the events in this case, the Defendant and the victim walked to a grocery store together. She said that the victim asked the Defendant to shop for him, that he wanted to walk home, and that he fell, lost his shoe, and was badly bruised. She thought the victim was able to walk home, though, before the Defendant returned. She thought this was not the incident about which Mr. Williams testified. She knew the Defendant had used drugs. She said that the Defendant worked for the victim and that he assisted the Defendant financially.

Ms. Willis testified that the victim called her house at about noon on November 8, 2009, and asked if the Defendant was there. She said that the Defendant had come to her house about 4:00 a.m. on November 8 and that Mr. Bryson was already at her house when the Defendant arrived. She said that the Defendant wanted to sleep but that she told the Defendant she could not sleep if she did not do it at night and that she told the Defendant she needed to leave. She said she last saw the Defendant at 7:00 or 7:30 a.m. when the

Defendant and Mr. Bryson left. She stated that the Defendant did not own a working car and that she did not know in whose car the Defendant arrived. She said that she tried to call the victim that afternoon to see if the Defendant had arrived with his car but that she did not reach him. She said that when she spoke with the victim that morning, he had not asked about his car. She said the victim called and spoke with her boyfriend a couple of times after she spoke with him around noon.

On cross-examination, Ms. Willis acknowledged that the Defendant had been a crack cocaine user. She acknowledged the Defendant had come to her for money when the Defendant was using drugs, although her testimony was unclear whether the Defendant asked for money or stole it. She was unsure how long the Defendant assisted the victim. She was unaware of the victim's and the Defendant's pawning each other's possessions but acknowledged knowing they went together to pawn his possessions. She agreed that about eight years earlier, the Defendant had been in Florida for about one year. She agreed that Mr. Bryson was the Defendant's boyfriend and that the victim was not. She knew that the victim reported the Defendant had stolen his car and that the case went to court but did not know of any additional reports of this nature. She agreed the Defendant sometimes left her house and did not return for a day or two. She said the Defendant's last employment had been caring for a friend's father six or eight years earlier. Regarding the prior incident in which the victim fell and lost his shoe, she said that the Defendant told her about it but that she did not witness it. She said Mr. Bryson did not live at her house. She was unaware of Mr. Bryson's having a job. She agreed the victim did not like Mr. Bryson. She did not know when the Defendant's relationship with Mr. Bryson began. She said the Defendant called her at 8:00 a.m. on November 9, 2009, after the Defendant found the victim.

The Defendant testified that she met the victim about three years before the relevant events. She said she saw him approximately every other day to a couple of times a week. She said that she had been divorced for fifteen years and that the victim never married. She said that she took the victim to medical appointments, that they grocery shopped, that they went to antique stores, that they ate in restaurants, and that she did his housework and cooking. She said that in return, the victim allowed her to use his car. She said she lived with her mother but sometimes stayed overnight at the victim's house because it was easier if she had to take him to a medical appointment. She said she had not owned a car for "a long time."

The Defendant testified that she never took advantage of the victim. She said the victim always looked at items and decided whether he wanted to keep them before she sold them at antique stores. She said they split the proceeds. She said that the victim received Social Security Supplemental Income (SSI) and that she was unaware of his having other income. She denied encouraging the victim to write "bad" checks but said she was aware

from his bank statements that his account was overdrawn. She said the victim gambled on sporting events and bought lottery tickets. She said the victim's "bookie" left money in his mailbox. She said that when the victim received his SSI checks, convenience store employees sometimes called and told her the victim had been in the parking lot for hours playing scratch-off lottery tickets. She said the victim would have taken the car key from her before she got out of bed and said he was "just" going to the store. She said that on other occasions, the victim walked to stores because he liked walking.

The Defendant testified that the victim complained to the Etowah Police Department about her taking his car. She said that when she returned to the victim's house, Chad Bogle was waiting in the driveway. She was unsure when this occurred. She said that she had gone to the store to get cigarettes and that the victim panicked when she did not return. She denied trying to sell the victim's car without permission, trying to "scrap" it for money, and leaving the county in it other than to take the victim to his medical appointments. She said that the victim paid for her to be on his car insurance for a few months but that she told him he did not have to have her on the policy if she did not live full-time in his household.

Regarding the events leading to November 9, 2009, the Defendant testified that she saw the victim on Friday around 2:30 a.m. She said she could not sleep due to a migraine headache and went to her mother's house for medication. She said the victim was on the couch shuffling cards. She said that he slept on the couch and that she slept in one of the bedrooms. She said she knew her mother was going to be upset with being awakened when she came in the house. She said her boyfriend of four years, Mr. Bryson, was at her mother's house.

The Defendant testified that she lived with Mr. Bryson previously but left before meeting the victim due to drug activity at Mr. Bryson's trailer. She said that Mr. Bryson had been convicted of promotion of the manufacture of methamphetamine and that although she was arrested when she pulled into the driveway, the charges were dismissed because she did not possess drugs or drug paraphernalia. She said she could not go back to Mr. Bryson's trailer because it was quarantined. She said Mr. Bryson was in jail for six months and then moved to his mother's house.

The Defendant testified that Ms. McCleary visited the victim at home and called to check on him. She said that although Mr. Cass never came to the victim's house, she had been in the car when the victim went to Mr. Cass's business to talk to him. She stated that Mr. Cass never called to check on the victim but that the victim spoke to Mr. Cass by telephone.

The Defendant testified that she made the list of furniture and dollar amounts. She said that a friend, Carol Blair, wanted to sell furniture Ms. Blair had stored in Englewood and that other friends were moving and needed furniture. She denied that she was trying to sell the victim's belongings and said, "That is a totally different set of furniture." She denied selling or pawning anything without the victim's permission.

The Defendant testified that damage to the front of the Defendant's car occurred several months before the victim was injured. She said that she was involved in an accident with a truck and that the victim's insurance paid him $1300.

Regarding the Saturday before the victim was found, the Defendant testified that she arrived at her mother's house around 3:00 a.m. She said she and Mr. Bryson stayed in the driveway the rest of the night because her mother would not permit them to come inside and sleep. She said they left about 7:30 a.m. and went to Mr. Bryson's quarantined trailer to retrieve personal belongings. She said most of the items found in the victim's car were their belongings from the trailer. She said she planned to put the items in the victim's basement or an outbuilding at her mother's house. She said she had other items stored in the victim's basement.

The Defendant testified that after she and Mr. Bryson left his trailer, they went through antiques with Wendy Millsaps. She said that Ms. Millsaps was concerned she would receive a probation violation for not paying her fees and that the Defendant identified items that could be sold. She said they planned to split the proceeds. She said that when they left Ms. Millsaps's house, they gave Penny Morgan a ride to Susan Shelton's house in Etowah. She said Darlene Frazier called and asked her for a ride from Parkstown to East Etowah. She said she and Mr. Bryson parked across the road from her mother's house for a while because they did not have money for gas. She said she received a text message from Ms. Morgan asking for a ride from Ms. Shelton's house to Ms. Millsaps's house. The Defendant testified that she talked to the victim by telephone several times on Saturday when she was at Ms. Millsaps's house. She said he stated that he was okay and that a home health nurse had not been to see him that day. She said that he had been released from the hospital on Halloween and that nurses were monitoring his Coumadin level daily. She thought she last spoke to him around 2:30 p.m. She said he did not ask her to return to his house or to return his car. She said she tried to call the victim around 4:00 or 5:00 p.m. but did not receive an answer.

The Defendant testified that she and Mr. Bryson spent Saturday night in Ms. Shelton's driveway because they did not want to wake the residents. She said they went inside around 5:00 a.m. Sunday morning when they saw the porch light come on. She said she knew the time because Sunday was her daughter's birthday and she always called her daughter at 6:46 a.m. on her birthday. She said that after she spoke with her daughter, she went to get cigarettes and fast food. She said she kept calling the victim, did not receive an answer, and

went to his house. She recalled leaving a message, which she said had not been played by the State during its case-in-chief, in which she sang nursery rhymes to try to wake the victim. She said that the victim did not have normal sleep patterns and that he frequently "nodded off" while sitting. She was aware of his medical history, including his pacemaker.

Regarding a statement of the victim that he thought he had been hurt elsewhere and brought to his house and left around 11:00 p.m. Saturday night, the Defendant testified that she never left with the victim and brought him back during the relevant time period. She said she had never had the victim and Mr. Bryson in the car together. Regarding the victim's November 12, 2009 statement that he and the Defendant argued about her using the car, she denied any such argument occurred on Saturday night. She said she did not see the victim from Friday night until Sunday morning, although she spoke with him by telephone. Regarding the victim's statement about a scuffle, she denied that she and Mr. Bryson had a scuffle with the victim at the broken bench. She said she never took Mr. Bryson to the victim's house until November 9, 2009. She denied that she dragged him about seventy-five feet with the car while he held the door handle.

The Defendant testified that the victim sometimes sat or talked on the telephone at the concrete bench but denied that she spent time near it. She said the bench had been broken before the victim was found on November 9, 2009. She did not know how the bench was broken but said she noticed it when she went to the house during the victim's October 2009 hospitalization.

The Defendant testified that although she had "tried" methamphetamine previously, she was not using it around November 9, 2009. Regarding her previous arrest involving methamphetamine at Mr. Bryson's trailer, she said she pulled into the driveway and never got out of the car. She said that she had no drugs or paraphernalia and that her charges were dismissed. When asked about prescription medication, she said, "I have never wanted to do pills." She knew the victim took pain medication. She said that she smoked crack cocaine, that the victim had been with her to purchase it, and that she used it at his house. She acknowledged Mr. Bryson used methamphetamine but said he had been in jail for six months until his release on August 15, 2009.

The Defendant denied the victim's allegations that the Defendant wanted to get more "dope"; that the victim did not want her to leave; that she, Mr. Bryson, and the victim fought; that she and Mr. Bryson beat the victim and threw something on him from the car; and that they left the victim lying on the ground. She said, "It never happened." Regarding the Faygo orange soda can found near the victim's cane and shoe at the bench, she denied that she or Mr. Bryson threw orange soda on the victim. She said she and the victim sometimes bought Faygo drinks at Fred's, which previous testimony established was near the victim's house.

She said the victim usually walked with a cane. She said the victim had his mailbox moved closer to his house after he became unable to walk down his long driveway but did not know when. She denied that she ever threatened to hit the victim with his cane or that she ever physically assaulted him. She said the only threat she made was to put the victim's car "on blocks" to prevent him from driving because he had totaled two cars and because she did not want to be responsible for his killing someone after his doctors told him not to drive.

The Defendant testified that she did not recall that she and the victim ever fought about her using the car and agreed that any arguments were about his driving it. Regarding her arrest related to taking the car, she said she left the victim's house to buy cigarettes when he was asleep and left him a note. She said the Defendant was unable to reach her because her cell phone was broken and was at the house. She said that he panicked and called the police, that Chad Bogle was in the driveway when she returned, and that she was arrested for theft. She said the theft charge related to her taking $20 from the bank to pay for gas, cigarettes, and Mountain Dew. She said this incident was the only time she went to jail for taking the car. She said the victim picked her up from jail and paid her probation fees. She said that the victim stated that he would never call law enforcement again and that he could have bought her a car for less money. She said she continued to live at the victim's house after the arrest.

The Defendant testified that she became concerned on November 9, 2009, when she could not reach the victim by telephone. She thought she and Mr. Bryson arrived at the victim's house around 7:30 or 8:00 a.m. She said that after the police arrived, they asked her to move the victim's car in order for an ambulance to reach the victim. She marked on a drawing the locations where she first parked, where she moved the car, and where she usually parked. She said that when she saw the victim unconscious on the ground, she tried to wake him. She said, though, he was able to respond by saying "okay" to her. She said she got a blanket and the telephone from the house, called 9-1-1, and put the blanket on the victim. She said Mr. Bryson stood by the car. She said that at some point, Mr. Bryson started walking away. She said they knew the victim would be mad if he saw Mr. Bryson. She said that she yelled for Mr. Bryson to help her and that the victim had a "look of rage." She said that the victim knew she previously dated Mr. Bryson and that once shortly after she met the victim, she had the victim take Mr. Bryson to work because she was sick.

The Defendant testified that she did not see that the victim's pants were melted but that she did not pay attention to his legs. She said Mr. Bryson noticed the victim's bruising and told her they could not move the victim and should call for help. She said the police officers thought the victim had been hit by a car due to his bruising. She said that when the police arrived, she went into the house to get a list of the victim's medications and his wallet for them.

The Defendant testified that Sergeant Armstrong told her she was not allowed to return to the victim's property. She said Sergeant Armstrong told her that the victim's sister had complained previously about her being at the victim's house. She said she had clothes at the victim's house that she never recovered. She said that she was walking away when Ms. McCleary arrived and that she did not remember talking to her. She said she was upset that she and Mr. Bryson had to walk home. She said she was not allowed to get her hairbrush or handbag from the car. She said she was upset because it was cold, she had to sit in a police car for forty-five minutes, the experience had been upsetting, she had been treated like a "common criminal," and they had to walk home.

The Defendant testified that she loved the victim and that she would have done anything to help him. She said that the victim proposed to her but that she refused because she did not love him romantically. She said they did not have a physical relationship. She said their relationship was mutually beneficial because she took him to medical appointments, cleaned his house, did his laundry, and provided companionship. She said they had good times together.

The Defendant testified that she knew Ms. McCleary from years ago because her younger brother had been friends with Ms. McCleary. She said she worked for Mr. Cass's father years earlier. Regarding Mr. Cass's testimony that she was a methamphetamine addict, she said people made assumptions about her.

The Defendant testified that the victim fell often. She said that on one occasion, they were at a grocery store together when the victim decided to walk home before she finished shopping. She said that when she returned home, the door was locked. She walked back to the store to look for the victim and did not find him. When she returned to the house a second time, the victim was in the living room with his back bleeding. When she asked the victim where he had been, he told her that he did not know "where the h---" he had been, that he had taken a shortcut, and that he had fallen. She said they searched a "briar thicket" the next day for the victim's lost cane and shoe. She said this occurred shortly before the victim's October hospitalization. She said that this incident was not the same fall about which Douglas Williams testified and that the Defendant lost a shoe in the incident Mr. Williams described.

The Defendant testified that she was arrested on December 3, 2009. She said she had powder cocaine, marijuana, and drug paraphernalia when she was arrested. She denied making any statements to other women who were in jail with her. She said she was housed in an "open pod" with about fifty women. She said that she had never been "crazy" about Brandi Stiles and that Ms. Stiles "was always a big liar." She denied confiding in her. She

said that during the time she was in jail with Ms. Stiles, television news provided information about her, Mr. Bryson, and the crime and stated that they confessed.

The Defendant testified that she and Cynthia Lewis's ex-husband had been high school classmates. She said Ms. Lewis came to jail visitation "clammed up" on methamphetamine. She said Ms. Lewis's statement regarding facts she allegedly told Ms. Lewis was "totally untrue." She said she was told that law enforcement asked witnesses, including Ms. Shelton and Kim Morgan, about methamphetamine chemicals having been thrown on the victim. She said that neither she nor Mr. Bryson had manufactured methamphetamine and that he only provided a place for its manufacture. She said that to her knowledge, methamphetamine was never made in the victim's house. Regarding Ms. Stiles's statement, she denied that she smoked marijuana before calling 9-1-1.

Regarding the victim's statement that she took the victim's keys from his pocket, the Defendant testified that he did not have keys. She said that she had one set of keys and that the other was at Title Max because he had pawned the car title.

On cross-examination, the Defendant testified that her mother's and the victim's houses were about ten minutes apart. She acknowledged that on the Saturday morning before November 9, 2009, she could have arrived at her mother's house around 4:00. She said she was "guessing" about the time. She said Mr. Bryson was already at her mother's house because she left him there around 4:00 p.m. on Friday when she went to the victim's house. She said that Mr. Bryson came outside with medication for her migraine and that they sat in the driveway. She denied they smoked crack. She agreed she and Mr. Bryson did not have jobs but said she sometimes had money from odd jobs. She said the victim sometimes had money. She agreed the victim sometimes gave her money and was with her when she bought drugs. She said that the victim did not use drugs and that she sometimes used them in her room at his house.

The Defendant testified that although she was thin in a photograph exhibit, she was not thin due to crack cocaine addiction. She said she had gained about thirty-eight pounds in jail because she did not get any exercise and was fed carbohydrates.

The Defendant testified that she did not sell any of the victim's furniture. She said he told her she could have anything she found buried in a collapsed outbuilding. She said that there were items in the attic she sold with his approval and that they split the proceeds.

The Defendant testified that although she was arrested in the victim's car in Mr. Bryson's driveway in February 2009, she had not been inside Mr. Bryson's trailer. She said that although she knew what was happening inside the trailer, she no longer lived there. She

agreed her daughter, Elisha Greene, was "using" the trailer as a methamphetamine laboratory. She said she was afraid of methamphetamine and agreed it was dangerous. She was aware a person might be burned by the chemicals.

Regarding Saturday, November 8, 2009, the Defendant testified that she and Mr. Bryson stayed at his trailer for two to three hours and went to Ms. Millsaps's house around 10:00 or 11:00 a.m., where they stayed until 7:00 or 8:00 p.m. She said they went to Ms. Shelton's house and stayed no more than forty-five minutes. She said they went to give Ms. Frazier a ride and arrived at her house about twenty minutes later. She said she and Mr. Bryson parked across the road from her mother's house and listened to the radio, talked, and "smooched." She said Ms. Morgan called around 10:00 or 11:00 p.m. to ask for a ride to Ms. Millsaps's house to pick up Joey Millsaps. She said they picked up Ms. Morgan and Mr. Millsaps and took them to Ms. Shelton's house around 11:00 p.m. to midnight. She said they picked up Ms. Frazier and dropped her off at her boyfriend's house around 2:30 a.m, then sat in Ms. Shelton's driveway from about 3:00 a.m. until about 5:00 a.m. She said that although she was unsure about the times she was at these locations, she was sure she was not at the victim's house that night.

Regarding the list of furniture and dollar amounts that was found on the victim's front porch, the Defendant testified that the victim had items in his home that were similar to those listed, including a new mattress and box springs. She said the victim's brother, Verlin, had furniture stored in the victim's house, including a new mattress and box springs.

The Defendant testified that Ms. Frazier introduced her to the victim when she gave Ms. Frazier a ride to his house in Mr. Bryson's truck. She said she went back later on her own and talked to the victim. When she decided to move out of Mr. Bryson's trailer, she asked the victim if she could store her belongings in his basement, and he agreed. She said that they started becoming friends and that he began offering to help with her transportation and taking her to restaurants. She said that later, he began asking her to take him to medical appointments. She said that the victim drove short distances at first but that eventually, his medical conditions worsened and that he could not drive. She did not recall the date she began staying at the victim's house but said it was no more than two years before his death. She recalled spending two Thanksgivings with the victim.

The Defendant testified that when she found the victim on November 9, 2009, she saw bruising on his hands before the EMTs removed his clothes. She acknowledged the victim did not have the same injuries the first time he fell but said he was not taking Coumadin then.

The Defendant testified that Mr. Bryson was not the "cook" for the methamphetamine production at his trailer. She said he received free drugs. She denied he gave her money.

-27-

When asked if he gave her drugs, she said he gave her "nothing but love." She said that the victim gave her money, that she chose what to do with her money, and that the victim did not support her drug habit. She said the people who testified about the victim's prior financial stability never came around him, but she was with him daily. She denied an ongoing tension existed about her using the victim's car. She said the victim apologized to her after her joyriding arrest.

The Defendant testified that the victim must have imagined she was at the house during the time he was on the ground injured. She said he made comments about things he was unsure were real or a dream, including his having raped a woman thirty years earlier. She said that the victim stated he was starting to sound like his brother, who had Alzheimer's Disease, and that she told him he needed to talk to a doctor.

The Defendant testified that on November 9, 2009, she parked near the victim. She disagreed with Chief Armstrong's testimony about the car being forty to fifty-five feet from the victim. She did not remember how many feet she moved the car when Chief Armstrong asked her to move for the ambulance. She denied telling Ms. Stiles that she and Mr. Bryson "beat down" the victim and that they made methamphetamine at the victim's house. She denied telling Ms. Stiles she waited a while after finding the victim before calling 9-1-1. She said Ms. Stiles had always been a liar. Regarding her statement, "It was bad," to Ms. Stiles, she said she was referring to the victim's condition. She said Ms. Stiles's statement that the Defendant laughed during a news broadcast about the crimes was "absurd." She denied that Mr. Bryson poured something from a jar onto the victim. She said Mr. Bryson was "clean" at the time. When asked if she or Mr. Bryson kicked the victim's testicles, she said she "never raised a hand" to the victim. She denied leaving messages for the victim because she was worried things had gotten out of hand. She said Ms. Morgan, Ms. Shelton, and Ms. Millsaps were afraid to cooperate with Chief Moses, to whom they referred as the "drug officer." She said that if they did not corroborate her testimony, they were lying.

On redirect examination, the Defendant testified that she thought she knew the victim around three years. She said the victim had tremor from Parkinson's Disease, a pacemaker, a defibrillator, and back pain that required shots at a pain clinic.

Regarding the joyriding arrest, the Defendant testified that she was gone about an hour. She said that if her cell phone had been working and with her, the victim would have asked if she thought it was time to come home and there would have been no further issue. She said the victim showed mental changes in the time she knew him.

Dr. Ronald Wright, an expert in clinical, anatomical, and forensic pathology, testified that he reviewed the victim's autopsy report, the Etowah Police Department records, the

victim's hospital records, most of the victim's prior medical records beginning around 2000, and the State's discovery. Regarding photographs of the victim, he noted discoloration and "skin slip" that was consistent with hypothermia. He also noted sun damage. He could not identify a cause of the victim's torn skin. He agreed skin damaged more easily as a person aged. He said that hypothermia caused a person to lose the sensation of cold and that victims sometimes took off their clothes. He said it was not unusual for a hypothermia victim to feel a burning sensation. He said that hypothermia caused discoloration from leaking blood vessels that looked like bruising. He said some injuries might have developed from the victim's having been picked up and moved by the emergency personnel. He said a person might develop injuries on the palms, knees, and stomach from crawling. He said scratches on the victim's abdomen were consistent with his having dragged himself on his abdomen. He was "essentially absolutely certain" that discoloration on the victim's abdomen was not from blunt force trauma and was not from a heel, fist, or billy club. He said that the abdomen generally did not bruise and that in his opinion, the discoloration was from hypothermia, although it could have been from blunt force trauma.

Dr. Wright testified that in his opinion, the sores and lesions on the victim's legs were from hypothermia, although he acknowledged they could have been from blunt force trauma. He said the injuries on the victim's arm and chest were "suspicious looking" and might have been from blunt force trauma. He said a more accurate determination could be made if pictures of the victim had been taken at the scene. He said that bruising to the victim's hip was not from kicking because kicking would cause greater injuries in an elderly victim. He said injuries on the victim's left hand were not consistent with defensive wounds and could have occurred when the victim was moved by emergency personnel. He said it was unlikely that discoloration around the victim's right eye was caused by blunt force trauma. In his opinion, the victim's enlarged scrotum was due to fluid retention from the administration of intravenous fluids to raise the victim's blood pressure, not blunt force trauma. He said none of the injuries in the photographs appeared to be burns. He did not think pseudoephedrine would burn skin. He said that three doctors commented in the medical records that the victim was an unreliable historian but that no mental examination for dementia was performed. In his opinion, the victim's dementia would have been worse after he developed hypothermia. He said that the victim developed renal failure and that the victim's family elected not to have dialysis performed. The victim's medical records from UT Medical Center were received as an exhibit.

Dr. Wright testified that he disagreed with Dr. Mileusnic-Polchan's conclusion about the cause of the victim's death. He said that the primary cause was hypothermia and that the sepsis was a complication of hypothermia. He said that the victim also had kidney, brain, heart, and lung diseases that were contributing factors and that the victim was "basically at

death's door" before developing hypothermia. He classified the victim's manner of death as undetermined because it could have been homicide, accidental, or natural disease.

Dr. Wright testified that the medical records that predated the victim's final hospitalization documented that the victim could not walk distances and that he used a cane. He noted an April 3, 2009 letter from one of the victim's doctors stating that the victim was incapable of getting his mail at the road and needed his mailbox moved to his front porch. He said that based upon this information, the victim might have fallen and his death been from natural causes.

On cross-examination, Dr. Wright testified that when the victim was admitted to the hospital, his Glasgow Coma Score, which measured mental status, was 9/15. He said the victim's score improved to the "teens" over time but never reached fifteen. Regarding Dr. Mileusnic-Polchan's characterization of some of the victim's injuries as bruises, he said an incision at the site was necessary to determine whether they were bruises. He said bruises did not occur unless a bone was underneath the skin. He said that swelling of the testicles from intravenous fluid therapy typically occurred after three or four days and that bruising would not result from administration of fluids. Regarding prior testimony about the victim's scrotum being swollen to the size of a cantaloupe, he said this might or might not indicate trauma.

Dr. Wright testified that frostbite did not melt pants fabric. He agreed that items used to manufacture methamphetamine were caustic and could "eat right through" skin and cause burns. He said it would be unusual for the items to melt pants, though, because they tended to cause explosions.

On redirect examination, Dr. Wright testified that he had concerns about the slow speed at which the victim's body was rewarmed when he was taken to the hospital. He said that allowing a patient to remain with a low core temperature for a longer time caused more things to "break." He agreed that a doctor noted on December 10, 2009, that the victim was unresponsive and incompetent. He agreed that the victim reported to hospital personnel that he could not walk well. On recross-examination, he said that his interest within the field of forensic pathology was the electric chair and that he helped design the State's electric chair.

Chief Moses was recalled as a defense witness and testified that his final conversation with the victim was December 9, 2009. He recalled the date because it was a day after his anniversary. He acknowledged that after reviewing his testimony in a previous hearing, his recollection was refreshed that the victim told him on December 9 that the Defendant participated in the scuffle after he was on the ground. He said the victim identified Mr. Bryson as the person who kicked him in the groin but agreed he had not mentioned it in his

previous testimony. He agreed he checked the victim's basement and did not find any evidence of methamphetamine production. He described different methods of methamphetamine production, including the "Shake and Bake" or "Shake Bottles" method involving shaking liquid and a lithium battery in a twenty-ounce bottle. He agreed the victim said something was poured on him and said he did not smell or see anything on the victim's shirt or undershirt to support this. He said he was unable to recover the victim's pants and thought they had been destroyed.

Chief Moses testified that he photographed pill bottles in the Defendant's bedroom at the victim's house. He said there were numerous empty or partially empty pill bottles in the kitchen.

On cross-examination, Chief Moses testified that despite the Defendant's testimony about the victim's having said he did not know "where the h---" he had been, he had never heard the victim curse unless he had been asked to repeat exactly what someone else said. He said that the victim walked about one and one-fourth miles to the police station to complain about his missing car and that the car was found at Mr. Bryson's trailer that day.

The 9-1-1 recording was played. It was not transcribed by the court reporter, and the recording was not made an exhibit.

On rebuttal proof, Ellen McCleary testified that she never heard the victim swear. On cross-examination, she said that she had seen the victim's reactions in many situations and that his vocabulary was always consistent.

William Scott Cass testified that the only time he ever heard the victim use a curse word was when the victim repeated the Defendant's statement, "You will not be needing these any more, you old bastard." He said the victim was asked not to participate in the choir due to his allowing the Defendant to live with him. He agreed that he blamed the Defendant for problems the victim had at the end of his life. He thought that the day he attempted to record the victim's statement was in November, not December, 2009.

Penny Morgan testified that she and Susan Shelton were roommates. She said that shortly after dark on November 9, 2009,[1] she asked the Defendant for a ride. She said that the Defendant and Mr. Bryson picked her up, that they were gone about twenty minutes, and that the Defendant and Mr. Bryson came into the house for about ten to fifteen minutes when they brought her back home. She said she did not see the Defendant again that night. She

---

[1] We note that other evidence shows that the victim was found in his yard on November 9, 2009.

was positive she only saw the Defendant once that night. She said she went to bed and was awakened by the police knocking on her door. She said she told the police the Defendant had not been with her all night long. She said she got out of bed around 3:00 or 4:00 a.m. to get a drink of water and heard a knock at the door but did not answer. She said she did not hear a car start after the knocking. She said that the Defendant later told her that the Defendant and Mr. Bryson stayed in the driveway until daylight but that she did not see them because no window was by the driveway.

On cross-examination, Ms. Morgan testified that the Defendant called her phone that night but that she did not answer. Regarding a prior statement, "Around 5:00 a.m. this morning they left maybe an hour later," she said she referred to the time someone had pulled into the driveway.

Susan Shelton testified that the Defendant came to her house on Saturday, November 8, 2009, around dark. She said that the Defendant was with Mr. Bryson and that she assumed they picked up Ms. Morgan. She said neither the Defendant nor Mr. Bryson came into the house when they picked up Ms. Morgan. She said they brought back Ms. Morgan about twenty to thirty minutes later and stayed in the house for about ten minutes. She said she did not see the Defendant again that night. On cross-examination, she agreed that she and the Defendant were friends and that Ms. Morgan and the Defendant were friends.

Wendy Millsaps testified that she was currently in rehabilitation for methamphetamine addiction. She said she and the Defendant were friends in 2009. She said she saw the Defendant the day before the victim was found in his yard. She said the Defendant came to her house about 10:00 a.m. and stayed for about two hours. She said Mr. Bryson was with the Defendant. She did not know whose car they drove but said it was green. She said they looked through her antiques to find items to generate money because she was afraid her probation was going to be revoked. She was certain the Defendant was not at her house for nine hours. She said she did not see the Defendant again that day and was certain the Defendant did not pick up her son that night. On cross-examination, she said that the Defendant told her she knew someone who would give her a good price for the antiques but that the Defendant never returned to pick up the antiques. On redirect examination, she said she was charged with manufacture of methamphetamine and had been clean for sixteen months.

Brandi Stiles testified that she and the Defendant had known each other for years. She said they were not friends but were acquaintances. She said that in late 2009 or early 2010 she was in jail for non-payment of child support. She said that when she was released, she gave a statement to the police. She said she was not asked to make the statement but did so

because she was concerned about what she had been told occurred. She denied she received anything for giving the statement.

Ms. Stiles testified that she and the Defendant talked at various times while they were in jail together. She said the Defendant initially said she and her boyfriend were not involved in the crime but eventually told her "[a]round about" that they were. She said the Defendant wanted Ms. Stiles and Ms. Stiles's boyfriend to provide an alibi for the Defendant and Mr. Bryson by saying the four of them stayed together for two days.

Ms. Stiles testified that she met the victim about a year earlier when she was with the Defendant at his house, that the victim gave the Defendant money, and that she and the Defendant left in the victim's car. She said that at first, the Defendant asked her for the "word on the street" about the victim. She said the Defendant stated that she found the victim on the ground, covered him, and called 9-1-1. She said that she did not watch television and that she read the newspaper only if someone told her to look at it that day.

Ms. Stiles testified that the Defendant overheard her on the telephone with her boyfriend discussing David Clauson, a person who assaulted someone. She said she and her boyfriend discussed a boot print on the person's chest from having been kicked and stomped. She said the Defendant said she saw Mr. Clauson and thought he harmed the victim. She said the Defendant went back and forth regarding whether she and Mr. Bryson did it or Mr. Clauson did it. She said the Defendant stated that the victim owed her $13,000. She said the Defendant stated that she "had been his little school girl and his little play toy for long enough and he promised it to her and owed it to her and she wanted it." She said the Defendant mentioned the money every time she talked about the victim.

Ms. Stiles testified that the Defendant told her that she and Mr. Bryson made methamphetamine at the victim's house when they had no other place. She said that the Defendant would leave the door unlocked when she took the victim to a store or a medical appointment and that Mr. Bryson would enter the home and make methamphetamine in the basement. She understood Mr. Bryson was not allowed around the victim. She thought the Defendant disclosed information to her because of their prior relationship when the Defendant dated Ms. Stiles's husband's uncle.

When asked to recount the most detailed account the Defendant had given her of the night the victim was injured, Ms. Stiles testified that the Defendant stated: Mr. Bryson was in the basement, and the Defendant and the victim were upstairs. The Defendant had hidden the victim's gun before Mr. Bryson arrived. The victim heard something and told the Defendant that he knew Mr. Bryson was in the basement and that he was going to put a stop to it once and for all. The victim started to go outside toward a shed. The Defendant yelled

-33-

for Mr. Bryson to come out of the basement. An altercation between the three took place. The Defendant looked for the gun she had hidden earlier. The victim ended up on the ground, and Mr. Bryson stomped the victim's chest with his boot.

Ms. Stiles testified that she did not recall if the Defendant said she participated in stomping and kicking the victim but that the Defendant always said, "We did it." Ms. Stiles said the Defendant stated that Mr. Bryson was a Marine, was trained to kill, and did not do anything unless someone told him to do it. She said the Defendant stated, "My God, if I told him to jump he would be standing there in the jump position to ask how high." She acknowledged the Defendant might have been bragging about her control over Mr. Bryson.

Ms. Stiles testified that she was in jail with the Defendant during a news broadcast about the Defendant's case. She said the Defendant laughed hysterically during the broadcast and stated that a beer bottle shown on the broadcast had been hers and that she had thrown it down after calling 9-1-1 and leaving before anyone arrived. She said the Defendant was confident and arrogant. She said she understood from the Defendant that the Defendant was unsure whether the victim was alive after the altercation. She said the Defendant told her that she and Mr. Bryson knew they had to get the methamphetamine manufacturing items out of the house and that Mr. Bryson cleaned the basement. She thought the Defendant said something about going into the upstairs part of the victim's house to get a blanket. She thought the Defendant said that when she came outside, "she noticed that he was wet and said she started asking Ricky [Bryson] why and at that point Ricky had evidently been in the basement and cleaned up anything[.]"

Ms. Stiles testified that no one had tried to influence her testimony. She said she had not been released from jail for her testimony and had to post a bond. She acknowledged a domestic assault conviction and denied any theft or shoplifting convictions.

On cross-examination, Ms. Stiles testified that she had been jailed for failure to pay child support and that while in jail, she had a probation violation because she could not visit her probation officer. Regarding her reason for talking to Larry Moses about the Defendant's statements, she said her boyfriend encouraged her to "do the right thing." She said she was in custody but was about to be released as soon as her child support payment was processed and she appeared in court the next day on her probation violation. She did not recall if she saw more than one news broadcast about the Defendant's case and said she did not watch television.

Ms. Stiles testified that the incident she discussed by telephone with her boyfriend involved an alleged assault of an elderly man, Alvin Shubert, by David Clauson. She said the Defendant questioned her about the telephone conversation and suggested that Mr.

Clauson might have injured the victim because she had seen Mr. Clauson's girlfriend and her child on the street near the victim's driveway. She said the Defendant mentioned several different scenarios for how the victim was injured, including that he had a firearm he was going to use to get Mr. Bryson away from his house and that the victim's bruises were consistent with Coumadin shots. She thought the Defendant was trying to justify to herself what happened to the victim.

Chadwick Bogle testified that he responded to the victim's house as an Etowah Police Officer on the day the victim was found. He said he had known the victim previously. He said the victim was lying on his back and looked "petrified," scared, and in pain. He said that when he asked the victim what happened, the victim moved his eyes to his left.

On cross-examination, Mr. Bogle testified that the Defendant was near the victim when he arrived and agreed that the victim was covered with a blanket. He said the victim never spoke to him. He saw the victim's bruises after the paramedics removed the blanket. He said he talked to the Defendant and Mr. Bryson within a few minutes of his arrival. He said the Defendant was cooperative in giving a statement.

The jury found the Defendant guilty of first degree felony murder in the perpetration of theft, aggravated assault, and theft of property valued at $1000 or more but less than $10,000. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support the convictions. The State contends that the convictions are supported by sufficient evidence. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Pertinent to this appeal, first degree felony murder is an unlawful "killing of another committed in the perpetration of or attempt to perpetrate any . . . theft[.]" T.C.A. §§ 39-13-

201 (2010), 39-13-202(a)(2). At the time of the offense, the aggravated assault statute provided, "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101" and "[c]auses serious bodily injury to another[.]" *Id.* § 39-13-102(a)(1)(a) (Supp. 2009) (amended 2010, 2011, 2013). The assault statute provided, in pertinent part, "A person commits assault who . . . [i]ntentionally, knowingly, or recklessly causes bodily injury to another[.]" *Id.* § 39-13-101(a)(1) (Supp. 2009) (amended 2010). "A person commits theft of property if, with the intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103 (2010).

The Defendant contends that the victim's statements were unreliable and lacked credibility. She argues that during his hospitalization, his mental status was poor, that he was under the influence of friends and family, and that he was subject to the "conduct" of the police investigator. She argues that some of the witnesses who were close to the victim were prejudiced against the Defendant and influenced the victim's statements. She notes the failure to capture the final statement in a video recording. The Defendant also contends that the testimony of Ms. Lewis and Ms. Stiles about the Defendant's statements lacked credibility. She argues that without the victim's and her statements, the remaining evidence is insufficient to support the convictions. As we have noted, questions of the weight to be afforded the testimony and the credibility of witnesses are entrusted to the jury as the trier of fact, and this court may not substitute its own evaluation of those matters. Our review is limited to consideration of the evidence in the light most favorable to the State. To the extent that the Defendant contends the victim's last statement was inadmissible, we will consider the issue in section II below.

Regarding the theft of property conviction, the evidence in the light most favorable to the State shows that during or immediately after Mr. Bryson and the Defendant assaulted the victim, the Defendant took the victim's keys and stated "Your car won't do you any good now you old bastard," or "You will not be needing these anymore, you old bastard." The victim did not want the Defendant to leave in his car. She drove away in the victim's car to pursue her own concerns. We note that the Defendant was charged with theft of property valued at $1000 or more but less than $10,000. The testimony of Mr. Cass, a used car dealer, established that the value of the victim's car fell within the relevant range. The evidence is sufficient to support the Defendant's theft conviction.

Relevant to the first degree murder and aggravated assault convictions, the Defendant contends that the medical proof was insufficient to establish the cause of the victim's injuries. He contends that it is just as likely the victim, who was in poor health, broke the bench accidentally, was injured, and fell. We again note that the weight of the evidence and the credibility of the witnesses was a matter for the jury's resolution.

In any event, both Dr. Mileusnic-Polchan and Dr. Wright attributed the victim's death to hypothermia, although they disagreed about the existence of blunt force trauma. Before his death, the victim consistently identified the Defendant and Mr. Bryson as having assaulted him and having taken his car. The Defendant made inculpatory statements to Ms. Lewis and Ms. Stiles about her involvement in an altercation with the victim.

Regarding first degree felony murder, the evidence is sufficient to show that the victim was killed during the perpetration of a theft. Although the victim did not die at the time of the theft, the medical experts attributed his death to the injuries he received during the altercation that occurred when the Defendant took the victim's car against his will.

The evidence is sufficient, as well, to support the aggravated assault conviction. Both medical and lay witnesses testified about the extent of the victim's frostbite injuries. Regarding the victim's discoloration, we acknowledge the conflicting proof regarding whether it was caused by blunt force trauma, the victim's medication, or frostbite. In the light most favorable to the State, though, the proof shows that the victim was assaulted. Before his death, the victim told Chief Moses that he had been in an altercation with the Defendant and Mr. Bryson and that both kicked him while he was on the ground. The Defendant implicated herself to Ms. Lewis, stating, "Girl, we beat him down." The Defendant is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred in admitting the victim's last statement under the dying declaration exception to the hearsay rule. She argues that the State failed to show that the victim believed his death was imminent. The State contends that the trial court properly admitted the statement. We agree with the State.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id.* at 802. The Rules of Evidence provide hearsay exceptions:

> (b) Hearsay Exceptions. – The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . .

(2) Statement Under Belief of Impending Death. – In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death[.]

Tenn. R. Evid. 804(b)(2).

The Defendant argues that the victim's medical condition had stabilized by the time he gave the statement. She notes that the statement was not given when the victim was first discovered in his yard on November 9, 2009, and that before the victim gave the statement, Chief Moses visited the victim several times and was told the victim was not ready to talk. She also notes that Chief Moses did not arrive to take the statement until the day after Ms. McCleary told him the victim was ready to give a statement. Although she acknowledges the victim's statements that he would not leave the hospital and was not "long for this world," she argues that the evidence fails to show that he was critically ill or near death or had a reasonable belief death was imminent and that the victim did not die on the day he gave the statement. She acknowledges that she introduced evidence in her case-in-chief of the victim's previous hospital statements but states that she did this to show the evolution of the victim's account and only because of the court's ruling on the admissibility of the final statement.

Chief Moses testified at a pretrial hearing and at the trial. He said the victim stated he knew he would not leave the hospital and that he was not long for the world. Dr. Wright testified that the victim's medical records showed the victim was unresponsive on December 10. Dr. Mileusnic-Polchan testified that the victim died on December 11. At the trial, Chief Moses and Mr. Cass testified that on December 9, the victim seemed more coherent than he had been. Mr. Cass testified that the victim seemed "at peace."

In its order addressing the Defendant's motion to exclude the victim's last statement, the trial court credited Chief Moses's testimony about the victim's belief that he would not leave the hospital and was not long for the world. The victim's statement reflects his belief that his death from his injuries was imminent. The record reflects, as well, that the victim's final statement related to the cause or circumstances of his injuries. *See id.*; 2 *McCormick on Evidence* § 311 (7th ed.); Neil P. Cohen, et al., *Tennessee Law of Evidence* § 8.36[2][e] (6th ed.). We conclude that the victim's statement was a dying declaration and that the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE